## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL E. BEYCHOK, JUSTIN WUNDERLER, KEITH MAUER, and JEFFREY KAUFMAN, individually and on behalf of all others similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ROBERT A. BAFFERT and BOB BAFFERT RACING STABLES, INC. | |
| Defendants. | |

Plaintiffs MICHAEL E. BEYCHOK, JUSTIN WUNDERLER, KEITH MAUER, and JEFFREY KAUFMAN, on behalf of themselves and all other similarly situated individuals, and through their undersigned counsel, bring this Class Action Lawsuit (the "Complaint") against Defendants Robert A. Baffert, Bob Baffert Racing Stables, Inc. (collectively, "Defendants" or the "Baffert Defendants") and, based upon personal knowledge and the investigation of counsel, allege as follows:

### NATURE OF THE ACTION

1.      Plaintiffs bring this Complaint on behalf of themselves and the "Class" (defined below) against the Baffert Defendants for violations of (i) the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)-(d) ("RICO"); and (ii) the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J.S.A. 2C:41-2; and for state common law and equitable fraud.

2.      Specifically, as detailed more fully herein, the Baffert Defendants participated in the operation of the affairs of one or more "association-in-fact" enterprises, described more

1

fully below, and conspired to do so, through a RICO pattern of racketeering activity.

3.      As described herein, the Baffert Defendants' multiple and repeated acts of doping and entering horses into thoroughbred races, including the Kentucky Derby, constituted racketeering activity as defined in 18 U.S.C. § 1961(1)(A), 18 U.S.C. § 1961(1)(B), and N.J.S.A. 2C:41-1(a)(1)(o) in that they (1) engaged in illegal gambling, which is chargeable under New Jersey law prohibiting the rigging of a publicly held contest (*see* N.J.S.A. § 2C:21-11); and (2) violated U.S.C. § 1952(a)(3) by traveling in interstate commerce and using a facility in interstate and foreign commerce – that is, the simulcast broadcasting by wire and television of the Kentucky Derby and other races – to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, including in violation of the laws of New Jersey – specifically, the rigging of a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

4.      Specifically, the Baffert Defendants' multiple and repeated acts of illegally doping and entering horses into thoroughbred races across the country constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(a) as they have committed at least two incidents of criminal profiteering within a ten-year period which are related and, as a result of their continued involvement in thoroughbred racing, pose a threat of continuing criminal activity extending indefinitely into the future.

5.      For example, on May 1, 2021, Defendants entered a doped horse, Medina Spirit, into the 147th running of The Kentucky Derby at Churchill Downs in Louisville, Kentucky and won a significant amount from the race's purse as part of a horse-doping scheme in thoroughbred racing. This scheme took place only approximately seven (7) months after a similar scheme in October 2020 when a Baffert-trained horse was disqualified from third place to last place in the

Longines Kentucky Oaks race after testing positive with *twenty-seven (27) picograms of betamethasone*. Baffert did not appeal the decision, and was fined $1,500, as set forth *infra*.

6.      The Baffert Defendants' unlawful conduct directly injured Plaintiffs in their business and property. Specifically, on May 1, 2021, Plaintiffs bet upon the horse that  finished in second place behind the drugged horse, Medina Spirit, at the Kentucky Derby at Churchill Downs.

7.      Plaintiff, Michael E. Beychok's ("Plaintiff Beychok"), betting tickets cost $966.00 and would have provided a minimum payoff of at least $10,000.00 - $100,000.00.  Plaintiff Beychok's wagers would have won, but for the illegal, drug-induced win by Medina Spirit. Thus, Plaintiff Beychok is entitled to bring a civil action against Defendants.

8.      Plaintiff Justin Wunderler's ("Plaintiff Wunderler") betting tickets cost roughly $2,000.00 and would have provided a minimum payoff of at least $40,000.  Plaintiff Wunderler's wagers would have won, but for the illegal, drug-induced win by Medina Spirit. Thus, Plaintiff Wunderler is entitled to bring a civil action against Defendants.

9.      Plaintiff Keith Mauer's ("Plaintiff Mauer") betting tickets cost roughly $5 and would have provided a minimum payoff in excess of $100. Plaintiff Mauer's wagers would have won, but for the illegal, drug-induced win by Medina Spirit. Thus, Plaintiff Mauer is entitled to bring a civil action against Defendants.

10.      Plaintiff Jeffrey Kaufman's ("Plaintiff Kaufman") betting tickets cost roughly$110 and would have provided a minimum payoff in excess of $4,000. Plaintiff Kaufman's wagers would have won, but for the illegal, drug-induced win by Medina Spirit. Thus, Plaintiff Kaufman is entitled to bring a civil action against Defendants.

11.      The Baffert Defendants further engaged in common  law and equitable fraud in that

Defendants misrepresented to bettors that they (1) entered a horse that complied with the race track rules; (2) that the misrepresentations were material because pari-mutuel wagering cannot function without fairness and administering a banned substance to a  horse is antithetical to the spirit of fair competition; (3) Defendants knew or believed that their representations were false; (4) Defendants intended that bettors such as Plaintiffs would rely on their misrepresentations to induce them to make wagers, as a track's purse structure comes directly from the total amount that is bet by the public; (5) Plaintiffs and the Class relied on these misrepresentations; and (6) Plaintiffs and the Class were damaged by Defendants' misrepresentations through the loss of their bets and winnings.

## PARTIES AND OTHER PARTICIPANTS

12.    Plaintiff Michael Beychok resides in Baton Rouge, Louisiana and is a part-time, pari-mutuel thoroughbred racing bettor.

13.    Plaintiff Justin Wunderler resides in Waretown, New Jersey and is a part-time, pari-mutuel thoroughbred racing bettor.

14.    Plaintiff Keith Mauer resides in Roseville, California and is a part-time, pari-mutuel thoroughbred racing bettor.

15.    Plaintiff Jeffrey Kaufman resides in Boca Raton, Florida and is a part-time, pari-mutuel thoroughbred racing bettor.

16.    Upon information and belief, Defendant Robert A. Baffert resides and conducts much of his business, Bob Baffert Racing Stables, Inc. (also a defendant in this case), in or around Los Angeles County, California and is a licensed  horse trainer of horses, including Medina Spirit, and was the trainer of Medina Spirit during the race in question.

## JURISDICTION AND VENUE

4

17.     Plaintiffs, individually and on behalf of the Class, assert claims against Defendants Robert A. Baffert and Bob Baffert Racing Stables, Inc. that are founded upon federal question subject matter jurisdiction under 28 U.S.C. § 1331, in regard to the Racketeer Influenced and Corrupt Organizations Act,18 U.S.C. § 1962.

18.     Venue for the Civil RICO claims is appropriate in this Court because Defendants Robert A. Baffert and Bob Baffert Racing Stables, Inc. conduct business in the State of New Jersey and, specifically, through this District.[1] Venue is also proper for these claims in this Court because Plaintiff Wunderler and other Class Members reside in New Jersey and, specifically, in this District.

19.     Plaintiffs, individually and on behalf of the Class, also assert common law fraud and equitable fraud claims against the Baffert Defendants. As set forth above, 28 U.S.C. § 1331 vests this Court with original subject matter jurisdiction. Venue is also proper for these claims in this Court because Plaintiff Wunderler and other Class Members reside in New Jersey and, specifically, in this District.

20.     This Court also has diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5 million, exclusive of interest and costs, and Plaintiffs and Class Members are citizens of states that differ from Defendants.

## FACTS

### I.     The World of Pari-mutuel Betting and Thoroughbred Racing

21.     Pari-mutuel betting is a system used in gambling on events, like thoroughbred racing, in  which participants finish in a ranked order. All bets of a particular type are placed

---

[1] The Baffert Defendants annually enter horses in the Haskell Invitational, the premier summer race at The Meadowlands Racetrack, located in East Rutherford, New Jersey.

together in a  pool and payoff odds are calculated by sharing the pool among all winning bets after taxes and  the "house-take" are removed. The payoff is determined by the pool size minus the "take," and  then divided by the number of winning tickets.

22.     Transmitting, re-transmitting, receiving, and rebroadcasting thoroughbred racing occurring live at an in-state location to one or more out-of-state locations by television or radio, through satellite or other electrical or electronic means, or receiving at an in-state location events which occur live at an out-of-state location, known as simulcasting, allows bettors to place wages without being physically present at the facilities where the race is occurring live. Race simulcasting also involves transmitting pari-mutuel wagering information to a central website, so that all bettors, even those in different locations, may participate in the same betting pool.

23.     Live thoroughbred races occur at various venues within the United States of America,  including at Churchill Downs, one of the world's most prestigious and legendary racetracks. Churchill Downs is located in Louisville, Kentucky. The Kentucky Derby is simulcast to other various locations via television and through internet betting sites such as TwinSpires.com and other wagering companies based in New Jersey and other states.

24.     Participating Bettors and members of the public expect that horses will give their best effort in every race and that all horses entered in every race will not be racing under the influence of a drug or foreign substance that has been administered in violation of racing rules and  regulations.

25.     Individuals, including the Baffert Defendants,  who are trainers of thoroughbred racing horses in the State of California are  required to be licensed under and follow California State laws, rules, and regulations.

26.     Furthermore, all competitors at Churchill Downs must comply with Churchill

Downs racetrack rules and regulations (the "Racetrack Rules"). The Racetrack Rules are strictly against the entry or participation of a horse in any race while carrying drugs or other banned substances in or on its body. By entering to compete, the applicants represent that they have abided by the Racetrack Rules.

27.     Bettors, including Plaintiffs and Class Members, rely on participants' representations that they comport with these laws, regulations, and rules in order to properly determine which horses to bet on.

28.     The Baffert Defendants and other trainers and owners intend that bettors rely on these representations in order to encourage wagering in racing, thereby increasing the purse total.

**II.    Defendants Violated Applicable New Jersey Law and Racetrack Rules, Resulting in Plaintiffs' and Class Members' Damages**

29.     Plaintiffs and Class Members conduct in-depth research prior to selecting horses upon which to place their bets. This research is based upon public information provided to them, some of which is provided by trainers such as the Baffert Defendants,[2] and upon the understanding that horse doping is banned in the sport of thoroughbred racing. For this reason, Defendants' misrepresentations that they were in compliance with laws, regulations, and Racetrack Rules on race day are material.

30.     On May 1, 2021, Plaintiffs placed their bets for the 147th running of the Kentucky Derby at Churchill Downs based upon their research and upon Defendants' material misrepresentations that they were in compliance with the laws, regulations, and Racetrack Rules governing the Kentucky Derby.

31.     Medina Spirit won the race, contrary to what Plaintiffs' and Class Members'

---

[2] This public information includes, but is not limited to, press conferences, interviews, the recording and dissemination of workouts, and reports on the general condition of the horse.

analysis and observations of the horse's previous racing form and research of the race suggested would be the result. Consequently, the other horses on which Plaintiffs and Class Members placed their bets finished second, third, fourth, and fifth, and so on, instead of first, second, third, and fourth, and so on.

32.      Following Medina Spirit's victory on May 1, testing from post-race blood samples revealed that Medina Spirit had been doped with a performance-enhancing substance, betamethasone, indicating a violation of the Commonwealth of Kentucky's equine medication protocols. As a result, Baffert was suspended indefinitely by Churchill Downs. However, Plaintiffs' pari-mutuel wagers were not altered. Further, assuming Medina Spirit is eventually disqualified by the Churchill Downs Stewards and placed last, the prize money for the race will be redistributed with the 2nd place finisher receiving the 1st place prize money, the 3rd place finisher receiving the 2nd place prize money, etc. However, the bettors of the race, including Plaintiffs and Class Members, will not receive the payoffs they would have been entitled to, but for the illegal participation of Medina Spirit.

33.      The initial post-race test was later confirmed on a split sample test. Upon information and belief, the Baffert Defendants knew that betamethasone had been administered to Medina Spirit since the horse was under Defendants' control, and since Defendant Robert A. Baffert himself admitted that Medina Spirit's positive test "may have been the result of exposure from an ointment that was applied to the colt for dermatitis."[3]

34.      While betamethasone is a Class C drug that is allowed in Kentucky as a therapeutic, state rules require at least a 14-day withdrawal time before racing, and any level of detection on

---

[3] *See* https://www.bloodhorse.com/horse-racing/articles/250061/baffert-ointment-could-have-caused-derby-drug-positive (last accessed July 21, 2021).

race day is a violation.[4]

35.     On or around June 14, 2021, Defendant Robert A. Baffert filed suit against the New York Racing Association (the "NYRA") in the United States District Court for the Eastern District of New York in response to the NYRA's suspension of Mr. Baffert from entering horses to race at Belmont Park, Saratoga Race Course and Aqueduct Racetrack. Mr. Baffert alleged violations of his right to due process following the NYRA's suspension.[5]

36.     The Baffert Defendants are not finished filing lawsuits to deflect their wrongdoing. They recently filed suit in Franklin County Circuit Court, Kentucky against the Kentucky Horse Racing Commission (the "KHRC") demanding a right to conduct additional testing on the urine sample at issue from Medina Spirit, "which [sample] sat undisturbed in the commission's freezer."[6]

37.     Following a determination by the Franklin Circuit Court judge that the Baffert Defendants would be permitted to do additional testing on the urine sample, the KHRC filed a status report and motion alleging a "lack of candor and contemptuous conduct by the New York Laboratory, plaintiffs [including Bob Baffert], or both."[7]

38.     The KHRC's status report and motion include allegations of original biologic samples of the urine sample being reportedly damaged before arrival at the Baffert Defendants' choice of labs, a broken serum separator tube, and another tube with serum that had been saved

---

[4] *Id.*

[5] The court issued a preliminary injunction in the case, pending a final hearing and determination of the action. *See Baffert v. The New York Racing Association, Inc.*, 21-cv-3329 (CBA) (RML).

[6] Judge: Extra Testing In Medina Spirit Case Will Go On, Only Question Is Sample Size - Horse Racing News | Paulick Report (last accessed July 22, 2021).

[7] KHRC Alleges 'Lack Of Candor And Contemptuous Conduct' By New York Lab, Baffert Attorneys - Horse Racing News | Paulick Report (last accessed July 22, 2021).

that was later presented at room temperature instead of frozen.[8] These allegations only further advance the allegations herein of the Baffert Defendants' fraudulent dealings within the world of thoroughbred horseracing.

39.     If Medina Spirit had been properly prohibited from competing as a result of the failure to meet this 14-day withdrawal requirement, Plaintiffs and Class Members would have won for the following types of bets: (1) win (bettor picks the horse that wins); (2) place (bettor picks the horse that finishes either first or second); (3) show (bettor picks the  horse that finishes first, second, or third); (4) exacta (bettor picks the two horses that finish first  and second, in the exact order); (5) trifecta (bettor picks the three horses that finish first, second, and third,  in the exact order); (6) superfecta (bettor picks the four horses that finish first, second, third, and fourth, in the exact order); (7) pick-3, pick-4, or pick-5 wagers; and (8) pick-6 pools (bettors who correctly selected Mandaloun, the 28-1 long shot who, following Medina Spirit's disqualification, would be the Kentucky Derby winner in their pick-6 wagers).

40.     But for the illegal entrance of Medina Spirit into the race, Plaintiff Beychok would not have lost the $966.00 invested in the race and would have instead won in excess of $10,000.00.

41.     But for the illegal entrance of Medina Spirit into the race, Plaintiff Wunderler would not have lost the roughly $2,000 invested in the race and would have instead won in excess of $10,000.00.

42.     But for the illegal entrance of Medina Spirit into the race, Plaintiff Mauer would not have lost the $5 invested in the race and would have instead won in excess of $100.

43.     But for the illegal entrance of Medina Spirit into the race, Plaintiff Kaufman

---

[8] *Id.*

would not have lost the $110 invested in the race and would have instead won in excess of $4,000.

## III.   The RICO Enterprises

### a.   The Robert A. Baffert and Bob Baffert Racing Stables, Inc. Enterprises and Association-in-Fact Enterprise

44.     Defendant Bob Baffert Racing Stables, Inc. is an "enterprise" within the meaning of 18 U.S.C. 1961(4).

45.     Defendant Robert A. Baffert, as an individual, is also an "enterprise" within the meaning of 18 U.S.C. 1961(4).

46.     At all relevant times, there has been and continues to be an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4) and N.J.S.A. 2C:41-1(c).

47.     Defendant Robert A. Baffert established Defendant Bob Baffert Racing Stables to train and board horses for the thoroughbred horseracing industry.

48.     Together, the Robert A. Baffert enterprise and the Bob Baffert Racing Stables enterprise have been, and continue to be, an association-in-fact enterprise (the "Baffert Enterprise") engaged in activities affecting interstate commerce, namely, through training horses racing at various tracks around the country, through entering horses into competition in various states, including racetracks in California and Kentucky, through race simulcasting and the rebroadcasting by television or radio of thoroughbred races occurring live at Churchill Downs and other racetracks to one or more out-of-state locations, and through advertisement of their activities via the Bob Baffert Racing Stables, Inc. website.[9]

49.     As part of its business model, the Baffert Enterprise trains horses owned by other parties, such as Zedan Racing Stables, Inc. ("Zedan Racing"), in order to obtain a portion of the

---

[9] See http://www.bobbaffert.com/ (last accessed July 20, 2021).

profits from horse winnings, including casino revenues when applicable. To accomplish this purpose, the Baffert Enterprise has been known to have used betamethasone and other similar drugs to enhance the performance of its trained horses and alter the results of publicly held horse racing contests in its trained horses' favor, thus engaging in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(d) as described more fully herein.

50.     Upon information and belief, the Baffert Enterprise has operated as a continuing unit for many years, demonstrating sufficient longevity to permit those associated with the enterprise to pursue the enterprise's purpose. In fact, the Baffert Enterprise has continued in operation, despite several doping violations.

51.     Upon information and belief, each member of the Baffert Enterprise performs a role in the group consistent with its organizational structures, thus furthering the activities of the Baffert Enterprise. For example, Defendant Robert A. Baffert owns Defendant Bob Baffert Racing Stables, Inc. and is a licensed trainer who trains and races thoroughbred horses and profits from the performance of any horse he enters in a race.

52.     As owner of Defendant Bob Baffert Racing Stables, Inc., Defendant Robert A. Baffert conducts the affairs of the Baffert Enterprise by directing and controlling the training of the horses.

**b.  The Zedan-Baffert Enterprise**

53.     At all relevant times, there has been and continues to be an "association-in-fact" enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of Zedan Racing, Defendant Robert A. Baffert, and Defendant Bob Baffert Racing Stables, Inc. (the "Zedan-Baffert Enterprise").

54.     Zedan Racing, at all times material hereto, served as the owner of the horse at issue

in this litigation. The Baffert Defendants, at all times material hereto, trained and had control over the horse at issue in this litigation.

55.     The Zedan-Baffert Enterprise is separate and distinct from the members themselves.

56.     The Zedan-Baffert Enterprise has operated as a continuing unit since at least early 2020 and continues, to this day, demonstrating longevity to permit those associated with the enterprise to pursue the enterprise's purpose, as the partnership is ongoing and has continued, despite the Baffert Defendants' past of horse-doping violations.

57.     At all relevant times, the Zedan-Baffert Enterprise has been, and continues to be engaged in, activities affecting interstate commerce by, namely, racing at various tracks around the country and through entering horses into competition in various states, including racetracks in California and Kentucky and through race simulcasting and the rebroadcasting, by television or radio, of thoroughbred races occurring live at Churchill Downs and other racetracks.

58.     The Baffert Defendants and Zedan Racing are each associated together for the common purpose of raising, training, and racing horses in order to win thoroughbred races, like the Kentucky Derby at issue here. To accomplish this purpose, however, the Baffert Defendants conducted the Zedan-Baffert Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and N.J.S.A. 2C:41-1(d) as described more fully herein.

59.     Each member of the Zedan-Baffert Enterprise performs a role in the group consistent with its organizational structure. For example, Zedan Racing conducts the affairs of the Zedan-Baffert enterprise by purchasing thoroughbred racehorses at auction or through other means and placing them in the care of Defendant Baffert Racing Stables, Inc., while Defendant Robert A. Baffert manages and controls the training of Zedan Racing's horses.

**IV.    The Baffert Defendants' Pattern of Racketeering Activity**

     **a.  State and Federal Statutory Violations**

60.    The Baffert Defendants' multiple and repeated acts of doping horses competing in thoroughbred races in states across the country, as more fully set forth on the attached **Exhibit 1**, constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(i), (1)(A), and (1)(B), and N.J.S.A. 2C:41-1(a)(1)(o).

61.    The racketeering activity includes violations of the Travel Act, 18 U.S.C. § 1952(a)(3), through horse doping in pari-mutuel sports betting. Defendants have traveled and used a facility in interstate and foreign commerce – that is, the simulcast broadcasting by wire and television of races at Churchill Downs and other racetracks – to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, including in violation of the laws of New Jersey, by rigging publicly exhibited contests in violation of N.J.S.A. § 2C:21-11.

62.    The racketeering activity also includes New Jersey gambling offenses punishable by imprisonment of more than one year, including specifically rigging publicly exhibited contests in violation of N.J.S.A. § 2C:21-11 by tampering with an animal, thereby preventing thoroughbred racing from being conducted in accordance with the rules and usage which govern it.

     **b.  Relatedness**

63.    The Baffert Defendants' acts are not isolated events; rather, they are a pattern of events related to each other in that they have similar purposes, participants, methods of commission, and other distinguishing characteristics. Relatedness is also established by the fact that all acts were done for the purpose of winning thoroughbred races, including but not limited to, the Kentucky Derby.

64.     For example, in January 2021, the California Horse Racing Board voted to let eventual 2018 Triple Crown winner and Baffert-trained horse, Justify, keep his Santa Anita Derby victory, *despite the detection of scopolamine in postrace samples of Justify*. The positive tests were revealed in a New York Times story in September 2019.[10]

65.     On October 20, 2020, a Baffert-trained horse was disqualified from third to last in the Kentucky Oaks, which was held on September 4, 2020, after testing positive with *twenty-seven (27) picograms of betamethasone*. The Baffert Defendants did not appeal and were fined $1,500.[11]

66.     On July 25, 2020, another Baffert-trained horse finished second in a race at Del Mar in California, *then tested positive after the race for the medication, dextromethorphan*. The Baffert Defendants were fined $2,500 for the violation on November 30, 2020.[12]

67.     In May 2020, two Baffert-trained horses tested positive for the painkiller lidocaine after victories at Oaklawn Park. Tests revealed 185 picograms in one horse, and 46 in the other. Arkansas stewards initially fined and suspended Defendant Robert A. Baffert fifteen (15) days for the violation. His appeal was heard, and the suspension was lifted, with fines reduced to $5,000 per horse.[13]

68.     On August 3, 2019, a Baffert-trained horse that finished fourth in a race at Del Mar tested positive for phenylbutazone. The Baffert Defendants were fined $1,500 for violation of the California Horse Racing Board rules. Defendants had been fined $500 just a week earlier for the same violation with another horse.

---

[10] See https://apnews.com/article/ky-state-wire-bob-baffert-sports-360b419b7f6fde781c78899976e2be7c (last accessed July 20, 2021).

[11] *Id*.

[12] *Id*.

[13] *Id*.

69.     These and many other confirmed acts of horse doping by the Baffert Defendants in recent years and throughout his career were attempts to further their goal of collecting the winning purse from the events in which their trained horses compete. Although continually fined by stewards for medication violations, the violations have continued, finally leading to a violation in the most important horse race in America, the 147th running of the Kentucky Derby.

70.     Moreover, in a further pattern of deceit, Defendant Robert A. Baffert released the following statement to the press on November 4, 2020, just two days before one of the biggest racing events of the year, The Breeder's Cup:

> "2020 has been a difficult year for everyone. It has been no exception for my family, my barn, and me. I am very aware of the several incidents this year concerning my horses and the impact it has had on my family, horse racing, and me. I want to have a positive influence on the sport of horse racing. Horses have been my life and I owe everything to them and the tremendous sport in which I have been so fortunate to be involved. We can always do better and that is my goal. Given what has transpired this year, I intend to do everything possible to ensure I receive no further medication complaints. As such, I want to announce that, beginning immediately, I plan to implement the following procedures in an effort to make my barn one of the leaders in best practices and rule compliance:
>
> 1.   I am retaining Dr. Michael Hore of the Hagyard Equine Medical Institute to add an additional layer of protection to ensure the well-being of horses in my care and rule compliance.
> 2.   I am increasing the training and awareness of all my employees when it comes to proper protocols.
> 3.   I am personally increasing my oversight and commitment to running a tight ship and being careful that protective measures are in place.
>
> I want to raise the bar and set the standard for equine safety and rule compliance going forward. For those of you that have been upset over the incidents of this past year, I share in your disappointment. I humbly vow to do everything within my power to do better. I want my legacy to be one of making every effort to do right by the horse and the sport."[14]

71.     Bettors were asked to assume that the Baffert Defendants had cleaned up their act

---

[14] *See* Baffert Issues Statement on Medication Issues (thoroughbreddailynews.com) (last accessed July 20, 2021).

and would be taking every step possible to ensure the horses in their care would no longer be administered illegal drugs prior to racing. Bettors, including Plaintiffs and the Class, relied on these assurances from the Baffert Defendants.

72.     On May 12, 2021, Defendant Robert A. Baffert's attorney, Craig Robertson, stated the following on the previously represented hiring of veterinarian Dr. Michael Hore:

> "There were initial discussions and plan to begin the process of it materializing … They did not materialize as expected due to COVID, but I've had conversations with Dr. Hore the last couple days about that very subject and discussing about getting that back on track."[15]

73.     Thus, once again, bettors (including Plaintiffs and the Class) were misled to place wagers under misleading circumstances, as the Baffert Defendants knowingly provided false information to the public and manipulated the media in order to enhance their reputation and mislead bettors. These misrepresentations come at the detriment of the bettors who rely on public information when betting on races, as discussed *supra*.

### c.  Continuity

74.     The Baffert Defendants' related pattern of racketeering acts and other violations have extended as far back as at least 1993 and have continued through the present, as shown in **Exhibit 1** and further highlighted in Section IV(b), *supra*.

75.     The Baffert Defendants' excuses for the doping violations committed over the years have included the following:

a.   A bagel containing poppy seeds may have been placed in Defendant Robert A. Baffert's barn;

b.   an employee wearing a "Salonpas" pain relief patch on his back may have

---

[15] Hore's Advisory Role for Baffert Did Not Materialize - BloodHorse (last accessed July 21, 2021).

transferred lidocaine from the patch to the horses when the employee applied their

tongue ties;

c.  a groom, who had been taking cough syrup, peed on hay in a horse stall and the

horse then ate the hay and tested positive; and

d.  the feed that Triple Crown winner, Justify, ate contained Jimson Weed, which was

responsible for Justify's positive drug test for scopolamine after his victory in the

Santa Anita Derby.

76.     These related predicate acts (and non-credible excuses), constitute a pattern of racketeering activities affecting interstate commerce designed to harm multiple parties. There is no foreseeable endpoint to the Baffert Defendants' acts of racketeering against bettors like Plaintiffs and the Class, which qualify as a continued threat of long-term racketeering activity to future victims.

77.     The Baffert Defendants, despite having been banned from racetracks in the past for doping, continue to train horses and enter them into racing competitions to this day.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this class action against the Baffert Defendants under Federal Rule of Civil Procedure 23 individually and on behalf of all others similarly situated. Plaintiffs assert all claims on behalf of the Class and Subclasses defined as follows:

### Nationwide Class

> All Kentucky Derby bettors who would have won their bets and winnings had Medina Spirit either been properly prohibited from competing in the Kentucky Derby on May 1, 2021 or competed without the aid of an illegal drug.

### [State] Subclasses

> All Kentucky Derby bettors residing in [state] who would have won

their bets and winnings had Medina Spirit either been properly prohibited from competing in the Kentucky Derby on May 1, 2021 or competed without the aid of an illegal drug.

79.     Excluded from the Nationwide Class and the State Subclasses (also collectively defined herein as the "Class") are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter, and members of their immediate families and judicial staff.

80.     Plaintiffs reserve the right to amend the above definitions or to propose alternative or additional subclasses in subsequent pleadings and motions for class certification.

81.     The members of the Class are referred to herein as "Class Members."

82.     Plaintiffs seek the certification of the Class under Rule 23 and RICO.

**a.   Class Certification is Appropriate**

83.     The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

84.     *Numerosity*: The proposed Class is believed to be so numerous that joinder of all members is impracticable.

85.     *Typicality*: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all members of the Class were injured through Defendants' uniform misconduct. The same event and conduct that gave rise to Plaintiffs' claims are identical to those that give rise to the claims of every other Class Member because Plaintiffs and each member of the Class lost money as a result of Defendants' RICO violations and violations of common law.

86.     *Adequacy*: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; Plaintiffs have

retained counsel competent and highly experienced in consumer protection class action litigation; and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

87.    *Superiority*: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

88.    *Commonality and Predominance*: There are many questions of law and fact common to the claims of Plaintiffs and the other Class Members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a.    Whether Defendants engaged in the wrongful conduct alleged herein;

b.    Whether the Defendants engaged in RICO violations as alleged herein;

c.    Whether Defendants' conduct, as alleged herein, resulted in or was the proximate cause of the monetary losses suffered by Plaintiffs and the Class;

d.  Whether Plaintiffs and the Class suffered injury as a proximate result of Defendants' actions;

e.  Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief;

f.  Whether Defendants' actions alleged herein constitute fraud;

g.  Whether Defendants' actions alleged herein constitute equitable fraud; and

h.  Whether Plaintiffs and Class members are entitled to punitive damages.

## FIRST CAUSE OF ACTION
### Violations of the Federal RICO Act, 18 U.S.C. § 1962(c)
### (On behalf of the Class or, alternatively, on behalf of the Subclasses)

89.  All paragraphs set forth above are incorporated by reference as if fully set forth herein.

90.  Plaintiffs and Class Members are persons "capable of holding a legal or beneficial interest in property" and thus are "person[s]" within the meaning of 18 U.S.C. § 1961(3).

91.  The Baffert Defendants are also persons or entities "capable of holding a legal or beneficial interest in property" and thus are a "person" and an "entity" within the meaning of 18 U.S.C. § 1961(3).

92.  The Baffert Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

93.  The Zedan-Baffert Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

94.  The Baffert Defendants were associated with the aforementioned enterprises and

have conducted or participated, directly or indirectly, in the management and operation of the affairs of each through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and 1961(5).

95.    The Baffert Defendants have conducted or participated, directly or indirectly, in the conduct of the enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

96.    The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(A) and (5) includes the multiple, repeated, and continuous acts of engaging in gambling chargeable under New Jersey law prohibiting the rigging of a publicly held contest under N.J.S.A. § 2C:21-11.

97.    The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(B), 1961(5), and 18 U.S.C. § 1952(a)(3) also includes traveling in interstate commerce and using a facility in interstate and foreign commerce – that is, the simulcast broadcasting by wire and television of races at Churchill Downs and other tracks – to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, including in violation of the laws of New Jersey, by rigging a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

98.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it, in violation of N.J.S.A. § 2C:21-11.

99.    As a direct result of the Baffert Defendants' violations of 18 U.S.C. §§ 1962(c), Plaintiffs and the Class have suffered substantial injury to their business or property within the meaning of 18 U.S.C. §§ 1964(c), including damages in the amounts alleged in the Complaint and to be further determined at trial. Plaintiffs and the Class are "persons" under 18 U.S.C. § 1962 and may sue therefore in this Court and "recover threefold the damages [they] sustain[] and the cost of

the suit, including a reasonable attorney's fee," pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
### Violations of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. 1962(c)
### (On behalf of the Class or, alternatively, on behalf of the Subclasses)

100.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

101.    Plaintiffs and Class Members are persons "capable of holding a legal or beneficial interest in property" and thus, are "person[s]" within the meaning of 18 U.S.C. § 1961(3).

102.    The Baffert Defendants are also "person[s]" or "entit[ies]" that are "capable of holding a legal or beneficial interest in property" and thus, are a person or entity within the meaning of 18 U.S.C. § 1961(3).

103.    The Baffert Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

104.    The Zedan-Baffert Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

105.    The Baffert Defendants conspired with each other and with the aforementioned enterprises within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, the Baffert Defendants conspired together to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Baffert and Zedan-Baffert Enterprises through a pattern of racketeering activity, as set forth in this Complaint.

106.    This act of conspiring to engage in the pattern of racketeering activity alleged herein, which falls under 18 U.S.C. §§ 1961(1)(A), 1961(1)(B), and 1961(5), includes the

multiple, repeated, and continuous acts of engaging in gambling chargeable under New Jersey law prohibiting the rigging of a publicly held contest.  N.J.S.A. § 2C:21-11.

107.   The pattern of racketeering activity under 18 U.S.C. §§ 1961(1)(B), (5), and 18 U.S.C. § 1952(a)(3) also includes traveling in interstate commerce and using a facility in interstate and foreign commerce – that is, the simulcast broadcasting by wire and television of races at Churchill Downs and other tracks – to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, including in violation of the laws of New Jersey, by rigging a publicly exhibited contest in violation of N.J.S.A. § 2C:21-11.

108.   Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it, in violation of N.J.S.A. § 2C:21-11.

109.   As a direct result of Defendants' violation of 18 U.S.C. § 1962(c), Plaintiffs and the Class have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including damages in the amounts alleged in the Complaint, to be further determined at trial.

## THIRD CAUSE OF ACTION
### Violations of the NJRICO Act, N.J.S.A. 2C:41-2
### (On behalf of the Class or, alternatively, on behalf of the Subclasses)

110.   All paragraphs set forth above are incorporated by reference as if fully set forth herein.

111.   Plaintiffs and Class Members are persons "capable of holding a legal or beneficial interest in property" and thus, are "person[s]" within the meaning of N.J.S.A. 2C:41-(b).

112.   The Baffert Defendants are also persons or entities "capable of holding a legal

or beneficial interest in property" and thus are each a "person" and an "entity" within the meaning of N.J.S.A. 2C:41-(b).

113.    The Baffert Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-(c). The Baffert Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

114.    The Zedan-Baffert Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

115.    The Baffert Defendants were associated with the aforementioned enterprises and have conducted or participated, directly or indirectly, in the management and operation of the affairs of each through a pattern of racketeering activity under N.J.S.A. 2C:41-2(c).

116.    The Baffert Defendants have conducted or participated, directly or indirectly, in the conduct of the enterprises through a pattern of racketeering activity within the meaning of N.J.S.A. 2C:41-1(a)(1)(o) by rigging a publicly exhibited contest in violation of N.J.S.A. 2C:21-11(a)(2).

117.    The pattern of racketeering activity under N.J.S.A. 2C:41-1(d)(1)-(2) includes the multiple, repeated, and continuous acts of rigging a publicly exhibited contest in violation of N.J.S.A. 2C:21-11(a)(2).

118.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it, in violation of N.J.S.A. 2C:21-11.

119.    As a direct result of Defendants' violation of N.J.S.A. 2C:41-2(c), Plaintiffs and Class Members have suffered damages within the meaning of N.J.S.A. 2C:41-4(c) in an amount

to be determined at trial.

### FOURTH CAUSE OF ACTION
### Violations of N.J.S.A. 2C:41-2(d) by Conspiring to Violate N.J.S.A. 2C:41-2(c)
### (On behalf of the Class or, alternatively, on behalf of the Subclasses)

120.     All paragraphs set forth above are incorporated by reference as if fully set forth herein.

121.     Plaintiffs and Class Members are persons "capable of holding a legal or beneficial interest in property" and thus, are "person[s]" within the meaning of N.J.S.A. 2C:41-(b).

122.     The Baffert Defendants are also persons or entities "capable of holding a legal or beneficial interest in property" and thus are each a "person" and an "entity" within the meaning of N.J.S.A. 2C:41-(b).

123.     The Baffert Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-(c). The Baffert Enterprise was engaged in activities affecting trade or commerce within the meaning of N.J.S.A. 2C:41-1(h) at all times relevant to this complaint.

124.     The Zedan-Baffert Enterprise is an "enterprise" within the meaning of N.J.S.A. 2C:41-(c) and was engaged in activities affecting interstate commerce at all times relevant to this complaint.

125.     The Baffert Defendants conspired with each other and with the aforementioned enterprises within the meaning of N.J.S.A. 2C:41-2(d) to violate N.J.S.A. 2C:41-2(c). Specifically, the Baffert Defendants conspired together to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Baffert and Zedan-Baffert Enterprises through a pattern of racketeering activity, as defined in N.J.S.A. 2C:41-1(d) and N.J.S.A. 2C:41-2(c) and as set forth in this Complaint.

126.     Defendants conducted or participated, directly or indirectly, in the conduct of the

enterprises through a pattern of racketeering activity within the meaning of N.J.S.A. 2C:41-2(c).

127.    The pattern of racketeering activity under N.J.S.A. 2C:41-1(d) and N.J.S.A. 2C:41-2(c) includes multiple, repeated and continuous acts of engaging in acts of rigging a publicly held contest, chargeable under New Jersey law and punishable by imprisonment for more than one year.

128.    Defendants have committed these activities for the express purpose of preventing a publicly exhibited contest from being conducted in accordance with the rules and usages which govern it, in violation of N.J.S.A. 2C:21-11.

129.    As a direct result of Defendants' violations of N.J.S.A. 2C:41-2(c), Plaintiffs have suffered substantial injury to their business or property within the meaning of N.J.S.A. 2C:41-1(c), including damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Common Law Fraud
### (On behalf of the Class or, alternatively, on behalf of the Subclasses)

130.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

131.    Defendants misrepresented to bettors that they entered a horse that complied with the Racetrack Rules, including and especially Racetrack Rules regarding horse doping. Defendants also misrepresented that they would be retaining Dr. Michael Hore prior to the race to ensure rule compliance.

132.    Defendants made these misrepresentations by virtue of, among other things, presenting Medina Spirit to race in the Kentucky Derby, as though they were compliant with Racetrack Rules.

133.    The Defendants' misrepresentations were material because pari-mutuel wagering cannot  function without fairness and administering a banned substance to a horse is unethical and

in contra to the spirit of fair competition.

134.    Defendants knew or believed that their  representations were false.

135.    Defendants intended that bettors such as Plaintiffs and Class Members would rely on their  misrepresentations in order to induce them to make wagers that would increase the track's purse, as a track's purse structure and bet payouts come directly from the total amount bet by the public.

136.    Plaintiffs and Class Members relied on these misrepresentations when researching and selecting  horses upon which to place their bets.

137.    Plaintiffs and Class Members were damaged due to Defendants' misrepresentations through the loss of their bets and winnings.

**SIXTH CAUSE OF ACTION**
**Equitable Fraud**
**(On behalf of the Class or, alternatively, on behalf of the Subclasses)**

138.    All paragraphs set forth above are incorporated by reference as if fully set forth herein.

139.    Defendants misrepresented to bettors that they entered a horse that complied with the Racetrack Rules, including and  especially those regarding horse doping. The Baffert Defendants also misrepresented that they would be retaining Dr. Michael Hore prior to the race to ensure rule compliance.

140.    These misrepresentations were material because pari-mutuel wagering cannot function  without fairness and administering a banned substance to a horse is antithetical to the spirit of  fair competition.

141.    Defendants intended that bettors such as Plaintiffs would rely on their misrepresentations to induce them to make wagers, as a track's purse structure comes directly  from

the total amount bet by the public.

142.    Plaintiffs and Class Members relied on these misrepresentations when researching and selecting  horses upon which to place their bets.

143.    Plaintiffs   and   Class   Members   were   damaged,   due   to   Defendants' misrepresentations, through the loss of their bets and winnings.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant judgment against Defendants and in favor of Plaintiffs as follows:

a.  certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class and Subclasses as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class and Subclasses requested herein;

b.  awarding damages in favor of Plaintiffs and the Class against Defendants, with pre- and post-suit interest thereon and other appropriate monetary relief, including attorney fees, expenses, costs, and such other further relief as is just and proper, for their violations of federal and state RICO law;

c.  awarding injunctive relief enjoining Defendants from engaging in any further racketeering acts;

d.  ordering Defendants to divest themselves of any interest (direct or indirect) in any enterprise, and imposing reasonable restrictions on their future activities in thoroughbred racing;

e.  requiring Defendants to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

f.   awarding damages against Defendants, jointly and severally, together with pre- and post-suit interest thereon, for the fraud claims against them;

g.   awarding Plaintiffs reasonable costs and expenses incurred in this action, including but not limited to, counsel fees and expert fees;

h.   ordering Defendants to pay to Plaintiffs and the Class the amount they would have won, but for the illegal doping of Medina Spirit;

i.   awarding Plaintiffs and the Class treble, consequential, and punitive damages; and

j.   awarding Plaintiffs such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: 7/23/2021

Respectfully Submitted,

Gary S. Graifman
**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Melissa R. Emert*
135 Chestnut Ridge Rd. -Suite 200
Montvale, NJ 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086
memert@kgglaw.com
ggraifman@kgglaw.com

William B. Federman*
*wbf@federmanlaw.com*
Oklahoma Bar No. 2853
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

Daniel P. Markoff*, OK Bar No. 14886
Jeffrey R. Atkins*, OK Bar No. 15076
**ATKINS MARKOFF ADLER LAW FIRM**
9211 Lake Hefner Parkway, Ste. 104
Oklahoma City, Oklahoma 73120
Telephone: (405) 607-8757
Facsimile: (405) 607-8749

Robert S. Green* (CA Bar No. 136183)
**GREEN & NOBLIN, P.C.**
 2200 Larkspur Landing Circle, Suite 101
 Larkspur, CA  94939
 Telephone: (415) 477-6700
 Facsimile: (415) 477-6710
 Email:  gnecf@classcounsel.com

*Pro Hac Vice* application to be submitted

*Counsel for Plaintiffs and the Proposed Class*